UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBBIN PERKINS,

    Plaintiff,

v.

                                        File No. 1:15-cv-8

ROCK-TENN SERVICES, INC.,           HON. ROBERT HOLMES BELL

    Defendant.
_____/

## **O P I N I O N**

Plaintiff Robbin Perkins brings this action against her former employer, Defendant Rock-Tenn Services, Inc. ("Rock-Tenn"), claiming that it paid her less than male employees in her position and that it failed to notify her of her right to continue her health insurance after she resigned from the company. Before the Court is Defendant's motion for summary judgment (ECF No. 42). For the reasons discussed herein, the motion will be granted.

**I.**

Defendant operates mills that produce merchandising displays, corrugated packaging, and consumer packaging. One of its mills is located in Battle Creek, Michigan. Plaintiff was hired by Rock-Tenn as a Shipping Superintendent in August 2010 with a starting salary of $70,000, the top end of the salary range for the job posting. (Pl.'s Dep. 125;[1] Job Information, ECF No. 43-6.) She replaced Bob Converse, who had worked at the company since 1979.

---

[1] Excerpts of Plaintiff's deposition transcript are located at ECF Nos. 43-3, 46-20.

(ECF No. 44-2.) His salary was $85,000 per year at the time of his retirement in 2010. (*Id.*) Over time, Plaintiff received regular salary increases. In February 2014, the month that she resigned, her salary was approximately $78,500. (Pl.'s Dep. 125.) She does not claim that she was paid differently from any other Shipping Superintendent at Rock-Tenn. Rather, she alleges that she was paid less than the employee who succeeded her. (Compl. ¶ 28, ECF No. 1.)

Some of Rock-Tenn's employees are union employees, paid on an hourly basis. In 2013, Plaintiff asked her supervisor, Tom Shannon, to provide her with a "Lead," which is a union employee that assists the Superintendent. (Pl's Dep. 131-33.) Plaintiff selected Gary Wood. (*Id.*) Wood started working at the Battle Creek mill in 1994. He initially worked as a Reserve, handling tasks assigned to him, and then he worked in the machine room for 16 years. (Wood Dep. 6-7.)[2] In 2009, he transferred to the shipping department. (*Id.* at 7.) When he became a Lead in 2013, he received a 12% pay increase over the hourly rate earned by a regular shipper, in accordance with the collective bargaining agreement. (*See* CBA 2004-2009 at 46, ECF No. 43-7; CBA 2009-2013 at 47, ECF No. 43-11; Wood Dep. 24.) Plaintiff also requested, and Wood was able to receive, another 12% increase as a "step up" or "production" lead, during hours when she was not working. (Wood Dep. 23-25.) He maintained this level of pay after Plaintiff left the company. (*Id.*) Wood earned a total of approximately $75,000 in 2012, $109,000 in 2013, and $113,000 in 2014.

---

[2]Excerpts of Wood's deposition transcript are located at ECF Nos. 43-9, 46-20.

On one occasion, Shannon asked Plaintiff to monitor the shipping area to ensure that no one threw cigarette butts on the ground and to issue citations if necessary. (Pl.'s Dep. 189-90.) Initially, she refused to do it, but then she issued a citation to one of the employees. (*Id.*) After a discussion with the manager of the mill, she was relieved of this responsibility. (*Id.* at 190.)

In addition, Plaintiff was asked to train and certify employees to drive industrial trucks. (*Id.* at 193-95.) Plaintiff believed that her time was better spent in the shipping department, but she began training sessions in January 2014. (*Id.* at 199.) Two or three weeks later, Wood took over responsibility for conducting these sessions. (*Id.* at 200-01, 204.)

Another responsibility assigned to her was to monitor the security staff at the mill and to act as a liaison with the security contractor responsible for that staff. (*Id.* at 179.) Plaintiff asked if there would be additional compensation associated with this new responsibility. (*Id.* at 209.) The general manager told her that he would look into it, but he never got back to her. (*Id.*) She never asked her direct supervisor for an increase in pay. (Shannon Dep. 27.)[3]

Over time, Plaintiff became frustrated with her supervisor. (Pl.'s Dep. 188.) He ignored her suggestions for improving the functioning of the shipping department. (*Id.* at 228-29.) In February 2014, Defendant was incurring $5,000 to $7,000 per week in detention costs, which are costs charged by independent trucking companies for the time their trucks spend idle on Defendant's premises waiting to be loaded. (*Id.* at 42.) Plaintiff suggested that

---

[3]Excerpts of Shannon's deposition transcript are located at ECF Nos. 43-8, 46-21.

Shannon correct this problem by pre-loading the trailers, but her suggestions were not implemented. (*Id.* at 184-85, 187, 225.)

On February 26, 2014, she met with her supervisor, the general manager, and the human resources director. The general manager mentioned that there was a problem with detention costs. Plaintiff indicated that she had given suggestions to Shannon to address this, who became red in the face after she made this comment. (*Id.* at 187.) The next day, Plaintiff resigned. Sometime after she left, Defendant cancelled her health insurance. Plaintiff claims that she never received any notice of her right to continue her health insurance.

After Plaintiff's resignation, Shannon assigned Wood to take over substantially all of her responsibilities. Unlike Plaintiff, Wood does not discipline employees and he does not act as liaison with the security service. (Shannon Dep. 48.) However, Wood helps with loading trucks, which is something that Plaintiff would "rarely" do because it is union work. (Pl.'s Aff. 4, ECF No. 46-2.) Wood and Shannon implemented a plan to reduce detention costs by pre-loading the trailers, resulting in significant savings.

## II.

Rule 56 of the Federal Rules of Civil Procedure requires the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "[T]he district court must construe the

evidence and draw all reasonable inferences in favor of the nonmoving party." *Martin v. Cincinnati Gas & Elec. Co.*, 561 F.3d 439, 443 (6th Cir. 2009) (citing *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007)). When such a motion is filed by the defendant, as in this case, the "plaintiff must do more than rely merely on the allegations of her pleadings or identify a 'metaphysical doubt' or hypothetical 'plausibility' based on a lack of evidence; [a plaintiff] is obliged to come forward with 'specific facts,' based on 'discovery and disclosure materials on file, and any affidavits[.]'" *Chappell v. City of Cleveland*, 585 F.3d 901, 912 (6th Cir. 2009) (quoting Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586-87). The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see generally Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476-80 (6th Cir. 1989). Where a defendant seeks summary judgment on an affirmative defense on which it will bear the ultimate burden of proof at trial, summary judgment is proper "'only if the record shows that [the defendant] established the defense so clearly that no rational jury could have found to the contrary.'" *Beck–Wilson v. Principi*, 441 F.3d 353, 365 (6th Cir. 2006) (quoting *Buntin v. Breathitt Cnty. Bd. of Educ.*, 134 F.3d 796, 800 (6th Cir. 1998)).

## III.

In Count I of the complaint, Plaintiff contends that she was paid less than male counterparts, in violation of the Equal Pay Act (EPA), 29 U.S.C. § 203 et seq.; Michigan's Minimum Wage Law of 1964 (MWL), Mich. Comp. Laws § 408.381 et seq.; and the Elliott-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2101 et seq. (Compl. ¶ 32.)

**A. Equal Pay Act**

The EPA prohibits employers from paying an employee at a rate less than that paid to employees of the opposite sex for work requiring "equal skill, effort, and responsibility," that is "performed under similar working conditions," unless such payment is made pursuant to a "seniority system," "merit system," or "a differential based on any other factor other than sex[.]" *See* 29 U.S.C. § 206(d)(1). "[T]o establish a prima facie case of wage discrimination, the EPA plaintiff must show that an employer pays different wages to employees of opposite sexes for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Buntin*, 134 F.3d at 799 (quotation marks and citation omitted). Plaintiff may establish her prima facie case by showing a wage differential between herself and her predecessor, *id.*, or between herself and her successor, *Dixon v. Univ. of Toledo*, 638 F. Supp. 2d 847, 854 (N.D. Ohio 2009). In this case, it is not disputed that the employee who preceded her as shipping superintendent, Bob Converse, and the employee who succeeded her in substantially all of her responsibilities, Gary Wood, were both paid more than her. The Court will analyze the circumstances of both employees to determine whether there is sufficient evidence to create a genuine issue of fact for trial.

    1. Gary Wood

Defendant asserts that Plaintiff has not established a prima facie case of discrimination based on the pay differential between her and Wood because Wood's position was different. Wood was a Lead. He did not hold the position of Shipping Superintendent. Moreover, as

a union employee, he lacked management rights, including the ability to hire, fire, promote, or discipline employees.[4]

These distinctions are not dispositive. At issue is whether Plaintiff's position and Wood's position require "essentially the same skill[s]" in order to perform them. 29 C.F.R. § 1620.15(a). "Skill includes consideration of such factors as experience, training, education, and ability. It must be measured in terms of the performance requirements of the job." *Id.* "Congress did not intend through use of the phrase 'equal work' to require that the jobs be identical." *Odomes v. Nucare, Inc.*, 653 F.2d 246, 250 (6th Cir. 1981). "[O]nly substantial equality of skill, effort, responsibility and working conditions is required." *Id.* In determining whether there is substantial equality in these respects in a given case, it is necessary to make "'an overall comparison of the work, not its individual segments.'" *Buntin*, 134 F.3d at 799 (quoting *Odomes*, 653 F.2d at 250). Thus, a difference in job titles has minimal relevance. *See Beck-Wilson*, 441 F.3d at 362 ("In determining whether a comparator is appropriate for the purposes of an EPA claim, our focus is on actual job requirements and duties, rather than job classifications or titles.").

Wood's inability to hire, fire, or discipline employees did not meaningfully distinguish his position from that of Plaintiff's. Wood testified that, when Plaintiff was still employed by Defendant, he filled in for her on the weekends or during her vacation, whenever she was not working. (Wood Dep. 14.) Generally, whatever she did during the week, he did during

---

[4]Under the collective bargaining agreement, Leads do not have the ability to hire, fire, or discipline employees. (*See* CBA, ECF No. 43-11, PageID.288.)

7

the weekend. (*Id.*) After she left, his duties remained essentially the same, but became full time responsibilities. (*Id.* at 23-25.) Defendant offers no evidence suggesting that a supervisor with authority to hire, fire or discipline employees requires significantly different skills or responsibility than a supervisor who lacks this authority. Moreover, there is no evidence that hiring and firing employees was a significant part of Plaintiff's position. Indeed, although Plaintiff had the authority to discipline, she was not necessarily required to exercise that authority. When she disagreed with her supervisor's request to issue citations to employees when they threw cigarette butts on the ground, she was relieved of that responsibility. (Pl.'s Dep. 190.)

Defendant also contends that Wood participated on an employee training team, whereas Plaintiff did not. (Shannon Dep. 57-58.) But Plaintiff avers that this team did not exist when she was employed by Defendant. (Pl.'s Aff. 4.) Moreover, she was involved in discussions and meetings about training with other members of the management team. (*Id.*) Thus, the Court cannot discern a significant difference based on Wood's participation on this team.

Defendant asserts that Wood worked more hours than Plaintiff. Wood testified that Plaintiff worked from 5:30 am to 3:00 or 4:00 pm at least six days per week, whereas Wood works approximately 11 hours per day, 5 days a week, and 8 hours per day on weekends. (Wood Dep. 56.) However, when Plaintiff started her position, before Wood was brought in as a lead, she worked 12 hours per day, every day of the week. (Pl.'s Dep. 109.) Thus, the

difference in hours worked appears to be tied to staffing levels rather than a difference in skills and responsibilities.

In short, the Court rejects Defendant's argument that Plaintiff cannot establish a prima facie case. Though a portion of Plaintiff's and Wood's responsibilities was different, it is not disputed that Defendant assigned the bulk of Plaintiff's responsibilities to Wood after she left, rather than hire a new Shipping Superintendent. This fact, coupled with the difference in pay, is sufficient to establish Plaintiff's prima facie case.

"Once the plaintiff establishes a prima facie case, the defendant must 'prove' that the wage differential is justified under one of the four affirmative defenses set forth under § 206(d)(1) of the Equal Pay Act: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than sex." *Buntin*, 134 F.3d at 799. "Because these are affirmative defenses, the defendant bears the burden of proof." *Beck-Wilson*, 441 F.3d at 360.

Defendant has offered evidence that the difference in compensation is due to the fact that Wood is a union employee and Plaintiff was not. Plaintiff received a salary set by management. Wood's wages are set by the collective bargaining agreement (CBA) with the union. (Shannon Dep. 93; Wood Dep. 17.) Rock-Tenn management does not have the ability to set compensation for union employees, except when engaged in negotiations for pay rates applicable to all union employees. (Shannon Dep. 93.) In addition, because Wood is a union employee, he is paid on an hourly basis and is able to earn overtime pay for extra hours worked during the week and on weekends. (Wood Dep. 17-18, 32.) In other words, there is

9

no genuine dispute that the difference in Wood's pay is based on the non-gender-related reason that he is a union employee paid on an hourly basis in accordance with a pay scale negotiated between Defendant and the union. In contrast, Plaintiff was paid an annual salary approved by management and subject to negotiation between her and the company. A pay differential resulting from a collective bargaining agreement is a factor other than sex. *See Thomas v. Cmty. Coll. of Philadelphia*, 553 F. Supp. 2d 511, 515 (E.D. Pa. 2008); *Cherrey v. Thompson Steel Co., Inc.*, 805 F. Supp. 1257, 1263-64 (D. Md. 1992); *Visnikar v. Dep't of Envtl. Prot.*, No. CIV.A. 02–963, 2004 WL 438688, at *14 (W.D. Pa. Jan. 27, 2004); *accord Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 925 (7th Cir. 2000).

In the Sixth Circuit, a factor other than sex must be one that is "adopted for a legitimate business reason." *EEOC v. J.C. Penney Co.*, 843 F.2d 249, 253 (6th Cir. 1998). It cannot be disputed that paying one employee more than another based on a different measure of compensation (hours worked versus an annual salary) in accordance with an agreement with a union is a legitimate business reason. Moreover, the Court notes that Wood received a higher level of compensation than Plaintiff due in part to her request that he receive an additional 12% raise in his rate of pay during hours when she was not available.[5] Plaintiff points out that this increase is not expressly mentioned in the CBA, but she does not dispute that he obtained it at her request. A request from Wood's supervisor (i.e., Plaintiff)

---

[5] Plaintiff asserts that this increase was obtained after she resigned (Pl.'s Br. in Opp'n to Mot. for Summ. J. 12, ECF No. 46.), but that assertion is not supported by any evidence. Wood testified that he received this increased while Plaintiff was still employed by Defendant.

is also a factor other than gender that was adopted for a legitimate business reason. Having agreed to Wood's hourly rate for legitimate reasons unrelated to gender, Defendant was not required to reduce that rate when he took over Plaintiff's responsibilities on a full-time basis.

Plaintiff asserts that Defendant could have chosen to hire a salaried employee after she resigned, rather than assign her responsibilities to Wood, but the EPA does not regulate such decisions. Employers are free to hire or promote whomever they choose, so long as any difference in compensation is based on factors other than sex. Construing the evidence in Plaintiff's favor, there is no genuine dispute that the pay differential between Plaintiff and Wood was based on factors other than sex.

After a defendant has proven its affirmative defense, the plaintiff can offer evidence to demonstrate that the defendant's reasons for the pay differential were pretextual. *Buntin*, 134 F.3d at 799 n.7. Plaintiff has not done so. Accordingly, the pay differential between Plaintiff and Wood does not support a claim under the EPA.

### 2. Bob Converse

Although she does not allege it in the complaint, Plaintiff asserts in response to the motion for summary judgment that her EPA claim is based, in part, on the difference between her salary and that of Bob Converse, her predecessor. In its motion for summary judgment, Defendant asserts that Plaintiff has not provided evidence of Converse's tasks and responsibilities in order to establish a prima facie case of substantial similarity between her position and the one held by Converse. The Court disagrees.

It is not disputed that Plaintiff took over Converse's position. (Pl.'s Dep. 99, 101.)

11

Indeed, Converse trained her how to do his job before he left. (*Id.* at 101, 106.) A wage difference with a predecessor suffices to establish a prima facie claim. *Buntin*, 134 F.3d at 799; 29 C.F.R. § 1620.13(b)(2).

Nevertheless, Plaintiff's EPA claim fails because there is no genuine dispute that the wage difference is attributable to Converse's long history at Defendant's company and his experience as a Shipping Superintendent. Converse held a supervisory position in the shipping department at least as early as 1984. (ECF No. 43-18.) In 1997, he was being paid approximately $52,000. (ECF No. 44-2.) By 2004, his salary had risen to $69,000. (*Id.*) Over the next six years, his salary gradually rose to $85,000. (*Id.*)

When she was hired in 2010, Plaintiff was given a salary at the high end of the range offered in the job posting, despite the fact that she had been unemployed for more than two years, had no experience at Defendant's company, no experience in Defendant's industry, and only four years of managerial experience. (*See* Pl's Answers to Interrog., ECF No. 47-2, PageID.606.) In other words, Converse had 26 years of management experience at Defendant's company in 2010, compared to 4 years of experience by Plaintiff at a different company in a different industry. "[Y]ears of relevant working experience [is] a factor other than sex which justifies starting wage differentials between male and female employees." *Murphy v. Ohio State Univ.*, 549 F. App'x 315, 319 (6th Cir. 2013).

As Plaintiff accumulated more experience at the company over the next three and a half years, her salary increased to almost $78,500. It did not rise as high as Converse's final salary of $85,000, but she did not remain at the company long enough to accumulate

comparable experience and seniority, or to receive incremental raises to reach that salary. Both Converse and Plaintiff received small increases in their salary on an annual or semi-annual basis. By way of rough comparison, during the last three and a half years of Converse's career, his salary rose by less than $6,000. (ECF No. 44-2.) During Plaintiff's similar length of time at the company, her salary rose at an even faster rate, by approximately $8,500. If that rate of increase continued, her salary would have surpassed Converse's within a few years, even though she would not have obtained his level of experience.

Plaintiff has acknowledged that she does know what factors were considered when changing her salary; she believed that it was based on adjustments to cost of living. (Pl.'s Dep. 125-26.) She offers no evidence to suggest that her starting salary or her pay raises (or lack thereof) were tied to her gender.

In short, Defendant's undisputed evidence indicates that any disparity between her salary and that of Converse was due to a difference in experience and seniority. Plaintiff offers no reason to believe that these reasons are pretextual. Thus, no rational jury could find that the difference in pay was based on her gender.

**B. Minimum Wage Law**

Plaintiff also asserts a claim under Michigan's Minimum Wage Law (MWL), Mich. Comp. Laws § 408.397. Like the EPA, the MWL prohibited discrimination in the form of differing wages. Defendant notes that this law was repealed on May 27, 2014. Plaintiff's complaint was not filed until January 5, 2015. Consequently, she cannot proceed under the MWL. *See Hurt v. Michael's Food Center*, 644 N.W.2d 387, 390 (Mich. Ct. App. 2002)

(noting that repeal does not divest a pending cause of action that accrued while the statute was in force). Moreover, Defendant asserts that the MWL and its successor, the Workforce Opportunity Wage Act (WOWA), Mich. Comp. Laws § 408.423, do not apply because Defendant is subject to the requirements of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 et seq. *See* Mich. Comp. Laws § 408.420 (stating that the MWL does not apply to an employer subject to the FLSA); Mich. Comp. Laws § 408.394 (same with regard to WOWA). Plaintiff apparently concedes this issue, as she asserts that she "need not discuss" her claim under the MWL because federal law "would occupy the field." (Pl.'s Br. in Opp'n to Mot. for Summ. J. 15, ECF No. 46.)

Plaintiff also concedes that the analysis of her claims under the foregoing laws is the same as that for her claim under the EPA. (*Id.*) Because the Court will award judgment in favor of Defendant as to the EPA claim, the Court will also award judgment in favor of Defendant as to Plaintiff's claims under the MWL and WOWA.

**C. Title VII**

Although not expressly identified in the complaint as the basis for a claim, Defendant asserts that Plaintiff cannot state a claim for wage discrimination under Title VII, 42 U.S.C. § 2000e et seq. The Court agrees. "An employer may . . . avoid liability under a Title VII wage discrimination claim if it can establish one or more of the four affirmative defenses in the EPA." *Beck-Wilson*, 441 F.3d at 369. Because Defendant has established an affirmative defense to the EPA claim, it is also entitled to summary judgment as to any claim for wage discrimination under Title VII.

Plaintiff contends that she states other grounds for discrimination. According to Plaintiff, her supervisor's refusal to take her advice is also evidence of intentional discrimination with regard to her gender.

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment . . . ." 42 U.S.C. § 2000e–2(a)(1). "This provision obviously prohibits discrimination with respect to employment decisions that have direct economic consequences, such as termination, demotion, and pay cuts." *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2440 (2013). Plaintiff does not allege any direct economic consequences from her supervisor's refusal to take her advice.

Title VII also "prohibits the creation of a hostile work environment." *Id.* at 2441. "In such cases . . . the plaintiff must show that the work environment was so pervaded by discrimination that the terms and conditions of employment were altered." *Id.* Discrimination in this form occurs "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65-67 (1986)) (internal citations omitted). A refusal to accept Plaintiff's recommendations is not a sufficiently severe and pervasive action to create an abusive work environment in relation to Plaintiff's gender.

Plaintiff also points to Defendant's decision to replace her with Wood rather than a salaried shipping superintendent. This is not evidence of discrimination toward Plaintiff. Moreover, as discussed above with respect to the EPA, Title VII requires employers to refrain from discrimination; it does not require them to hire one type of employee over another.

Finally, Plaintiff refers to the second 12% wage increase given to Wood as evidence of discrimination. As discussed above, however, Plaintiff requested this increase. Thus, she cannot complain that it was given to Wood on the basis of gender.

Consequently, the Court will grant judgment in Defendant's favor as to Plaintiff's claim under Title VII.

**D. Elliott-Larsen Civil Right Act**

To the extent Plaintiff asserts a claim of wage discrimination in violation of the ELCRA, her claim fails for the same reasons that her EPA and Title VII claim fail. *See Foco v. Freudenberg-NOK Gen. Partnership*, 549 F. App'x 340, 347 (6th Cir. 2013) (affirming summary judgment for Title VII and ELCRA claims of wage discrimination where Defendant was entitled to summary judgment on the EPA claim).

For all the foregoing reasons, the Court will grant judgment in favor of Defendant as to Count I of the complaint.

**IV.**

In Count II, Plaintiff alleges that Defendant failed to comply with COBRA because it did not send her a notice that she was entitled to continue her health insurance benefits.

COBRA requires employers to notify employees of their right to continue health insurance coverage after a "qualifying event." *See* 29 U.S.C. § 1166(a) (notice requirement); 29 U.S.C. § 1162 (continuation of coverage); 29 U.S.C. § 1163(2) (termination of covered employee as qualifying event).

Defendant offers evidence that it did send such notices. The human resources director for Rock-Tenn, Karol Fecteau, asserts in an affidavit that Rock-Tenn's regular practice is to send notice to a third-party vendor, Aon Hewitt, that an employee has departed. (Fecteau Aff., ECF No. 43-24.) Aon Hewitt is responsible for sending the notices. Documents from Aon Hewitt, which are attached to the affidavit, purport to show that notices were sent to Plaintiff on March 7, 2014 and on February 17, 2015. (Ex. to Fecteau Aff., ECF No. 43-24, PageID.382-84.) These documents include an electronic copy of the notice and what appears to be a screenshot of an Aon Hewitt database entry showing Plaintiff's name and several dates, one labeled "Initially Created," another labeled "Effective," and a third labeled "Since." (*Id.*) Above the screenshot there is text stating, "Screenshot below shows the notice was created on 3/7/14 for effective date of 2/27/14. It was created a second time on 2/17/15 and '# Times created = 2' verifies it was sent on[e] time and sent a second time[.]" (*Id.* at PageID.384.) Fecteau avers that she reviewed these documents and that they confirm that the notices were sent.

Plaintiff notes that Fecteau does not contend that she herself sent the notices; thus, she does not have personal knowledge of whether they were sent. Plaintiff also objects that the copy of the notice and the screenshot are hearsay. Generally, a court may not consider

hearsay evidence when deciding a summary judgment motion. *Tranter v. Orick*, 460 F. App'x 513, 514 (6th Cir. 2012). Exceptions to this rule include documents such as affidavits, depositions, and answers to interrogatories. *Id.*

The Court agrees that Fecteau's affidavit lacks foundation and that the exhibits purporting to show that Aon Hewitt mailed the notices to Plaintiff are hearsay. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). The screenshot and explanatory text are not sworn statements by Fecteau; they are merely commentary and a picture from an unknown source purporting to establish the truth of the matter asserted, i.e., that Aon Hewitt sent two notices to Plaintiff. It does not appear that the screenshot would satisfy any exception to hearsay. Fecteau does not assert that it is a record kept in the ordinary course of business. Fed. R. Evid. 803(6). Thus, her affidavit and its exhibits are not sufficient in themselves to establish that Defendant complied with COBRA.

Rule 56(c)(2) permits a party to "object that material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). In response to an objection under Rule 56(c)(2), the Court may take one of several steps, including giving the party an opportunity to properly support or address the fact, or issuing any other appropriate order. Fed. R. Civ. P. 56(e)(1)-(4). Accordingly, the Court will give Defendant an opportunity to properly support its evidence by considering the evidence that it submitted in its reply in support of the summary judgment motion. That evidence includes an affidavit by Clyde Watson, the Delivery Manager for Aon Hewitt. (Watson Aff.,

ECF No. 47-10.) Watson asserts that he is responsible for ensuring that COBRA notices are sent to departing Rock-Tenn employees, as directed by Rock-Tenn. (*Id.*) According to his review of Aon Hewitt's computer records, it sent COBRA notices to Plaintiff by regular mail on March 7, 2014, and on February 17, 2015. (*Id.*) Watson's affidavit properly supports Defendant's contention that it complied with COBRA by having notices mailed to Plaintiff. The fact that Plaintiff did not receive these notices does not mean that Defendant failed to comply with COBRA. "Several courts have specifically found that employers are in compliance with § 1166(a) when they send COBRA notices via first class mail to an employee's last-known address." *Torres-Negrón v. Merck & Co., Inc.*, 488 F.3d 34, 45 (1st Cir. 2007) (citing *Holford v. Exhibit Design Consultants*, 218 F. Supp. 2d 901, 906 (W.D. Mich. 2002); *Torres–Negrón v. Ramallo Bros. Printing, Inc.*, 203 F. Supp. 2d 120, 124-25 (D.P.R. 2002)). There is, thus, no genuine dispute that Defendant complied with COBRA. Consequently, the Court will also grant summary judgment in Defendant's favor as to Count II of the complaint.

## V.

In summary, the record shows that no reasonable jury could find in favor of Plaintiff. Accordingly, Defendant's motion for summary judgment will be granted.

An order and judgment will be entered consistent with this Opinion.

Dated: June 6, 2016                               /s/ Robert Holmes Bell
ROBERT HOLMES BELL
UNITED STATES DISTRICT JUDGE